**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| BRETT CONNER, JUWAN OVERSHOWN, DIANE EDWARDS, STEPHEN FOLLETT, RODERIC WOODS, JOHN CRIST, CHRIS HARRIMA, and TYRONE GIBBS, *individually and on behalf of all others similarly situated*, | Case No. 3:25-cv-00945 |
| Plaintiffs, | |
| v. | |
| CPAP MEDICAL SUPPLIES AND SERVICES INC., | |
| Defendant. | |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Brett Conner, Juwan Overshown, Diane Edwards, Stephen Follett, Roderic Woods, John Crist, Chris Harriman, and Tyrone Gibbs (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this action against Defendant CPAP Medical Supplies and Services, Inc. ("Defendant"), alleging as follows.

## I. INTRODUCTION

1. This class action arises from Defendant's failure to properly secure and safeguard Plaintiffs' and over 90,000 Class Members' sensitive personal health information ("PHI") and personal identifiable information ("PII"), from being stolen by cybercriminals in a foreseeable, preventable data breach.

2.      Over the course of a week in December 2024, criminal hackers accessed Defendant's network systems and stole Plaintiffs' and Class Members' PII and PHI stored therein, including their full names, dates of birth, driver's license numbers, Social Security numbers, financial and banking information including account and routing numbers, digital signatures, medical information, health insurance information, and other sensitive data (collectively, "Private Information"), causing widespread injuries to Plaintiffs and Class Members (the "Data Breach").

3.      After the Data Breach, cybercriminals posted Plaintiffs' and the Class Members' Private Information for sale on the dark web. Plaintiff Edwards has already received multiple notifications (beginning in early 2025) informing her that her Private Information was found published on the dark web.

4.      Defendant is a Florida-based provider of continuous positive airway pressure ("CPAP") devices and other medical equipment for patients with sleep apnea, servicing active duty and retired military and their families.

5.      Plaintiffs and Class Members are current and former patients and customers of Defendant, who were required to entrust their sensitive, non-public Private Information to Defendant as a condition of receiving Defendant's medical device products and related services.

6.      Defendant benefited substantially from Plaintiffs' and Class Members' Private Information and could not perform its operations or provide the services it does without collecting and using that data. For example, Defendant required Private Information to receive assignments of benefits from Plaintiffs and bill and

collect payment for its services. Additionally, on information and belief Defendant profits from price premiums on CPAP devices that integrate Plaintiffs' and Class Members' electronic PHI.

7.     Healthcare entities that handle patients' Private Information (like Defendant) owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to the invasion of their private health and financial matters.

8.     The mechanism of the cyberattack and potential for improper disclosure of Private Information was or should have been a known risk to Defendant, and thus, Defendant knew failing to take reasonable steps to secure Plaintiffs' and Class Members' Private Information left it in a dangerous condition.

9.     Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter disregard for Plaintiffs' and Class Members' privacy.

10.     Defendant breached its duties to Plaintiffs and Class Members by

3

failing to safeguard the Private Information that it collected and maintained, including by failing to implement industry-standard data security preventing unauthorized access, to protect Private Information once unauthorized access occurred, or to stop the Data Breach until a week after it began. These failures caused and allowed criminal hackers to access and steal tens of thousands of individuals' Private Information from Defendant's care.

11. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes, potentially for the rest of his or her life. Mitigating that risk, to the extent even possible, requires significant time and money on prophylactic measures.

12. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Defendant's systems because of the data's value in exploiting and stealing Plaintiffs' and Class Members' identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

13. The risk of identity theft caused by this Data Breach is impending and has materialized, as there is evidence that Plaintiffs' and Class Members' Private

Information was targeted, accessed, misused, and disseminated on the dark web.

14.    As a result of the Data Breach, Plaintiffs and Class Members, suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

15.    To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence/negligence *per se*, breach of implied contract, and unjust enrichment to address Defendant's inadequate safeguarding of Plaintiffs' and Class Members' Private Information in Defendant's care and the host of injuries that resulted.

## II. PARTIES

### *Plaintiffs*

16.    Plaintiff Brett Conner is an adult individual and a citizen and resident of Island County, Washington.

17.     Plaintiff Juwan Overshown is an adult individual and a citizen and resident of Prince William County, Virginia.

18.     Plaintiff Diane Edwards is an adult individual and a citizen and resident of Bexar County, Texas.

19.     Plaintiff Stephen Follett is an adult individual and a citizen and resident of Cumberland County, North Carolina.

20.     Plaintiff Roderic Woods is an adult individual and a citizen and resident of Texas.

21.     Plaintiff John Crist is an adult individual and a citizen and resident of Jefferson County, Colorado.

22.     Plaintiff Chris Harriman is an adult individual and a citizen and resident of Okaloosa County, Florida.

23.     Plaintiff Tyrone Gibbs is an adult individual and a citizen and resident of North Carolina.

### *Defendant*

24.     Defendant CPAP Medical Supplies and Services Inc. is a Florida corporation with its principal place of business at 8930 Western Way, Suite 4, Jacksonville, FL 32256.

### III.   JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of

Class Members exceeds 100, many of whom have different citizenship from Defendant.

26.    This Court has personal jurisdiction over Defendant because it is a Florida citizen headquartered in Florida, and it engages in substantial and not isolated activity in this state.

27.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant operates in this District and a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## IV.  GENERAL FACTUAL ALLEGATIONS

### A.    Defendant Benefitted from Plaintiffs' and Class Members' Private Information and Promised to Protect It.

28.    Defendant is a Florida-based provider of CPAP devices and other medical equipment for patients with sleep apnea, who are typically active and retired military and their families.

29.    Plaintiffs and Class Members are current and former patients and customers of Defendant, who were required to entrust their sensitive, non-public Private Information to Defendant as a condition of receiving Defendant's medical devices and related services.

30.    Defendant benefited substantially from Plaintiffs' and Class Members' Private Information, and could not perform its operations or provide the services it does without collecting and using that data.

31.     Defendant required Plaintiffs Class Members to provide Private Information to receive assignments of benefit from Plaintiffs and Class Members and to bill and collect payment for its products, the source of Defendant's revenue. Additionally, on information and belief Defendant profits from price premiums on CPAP devices that integrate Plaintiffs' and Class Members' electronic PHI.

32.     In its mandatory collection of Plaintiffs' and Class Members' Private Information, Defendant promised to safeguard the sensitive data maintaining its confidentiality, to use the data only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

33.     For example, Defendant's Notice of Privacy Practices promised and affirmed to Plaintiffs and Class Members, "We are required by law to maintain the privacy of your protected health information and to . . . abide by the privacy policies and practices that are outlined in this notice."[1]

34.     Further, Defendant's Notice of Privacy Practices warrants that Private Information will be disclosed only in the specific enumerated circumstances, which do not include disclosure to cybercriminals in a breach.

35.     Thus, Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that

---

[1] Privacy Practices, CPAP Medical, https://cpapmedical.com/privacy-practices.php.

Defendant would comply with its promises and duties to keep such information confidential and protected from unauthorized access.

36.    But for Defendant's promises to keep their Private Information secure and confidential, Plaintiffs and Class Members would not have sought services from or entrusted their Private Information to Defendant. Healthcare patients and consumers, in general, demand security to safeguard their Private Information, especially when sensitive medical information is involved.

37.    At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiffs and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

38.    Defendant also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private medical information.

39.    By obtaining, using, and benefiting from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

40.    Defendant had and has a duty to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from

involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT networks and processes.

41.     Additionally, Defendant had and has obligations created by the FTC Act, 15 U.S.C. § 45, HIPAA, common law, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure. Defendant failed to do so.

**B.    Defendant Failed to Adequately Safeguard Plaintiffs' and Class Member's Private Information, Causing the Data Breach.**

42.     On or about August 15, 2025, Defendant began sending Plaintiffs and other Data Breach victims correspondence informing them of the Data Breach ("Notice Letters").

43.     The Notice Letters generally inform as follows, in part:

*What Happened?*

As a result of a cybersecurity incident, CPAP learned that an unauthorized actor gained access to our network environment.

*What We Are Doing.*

Upon learning of this issue, we immediately worked to contain the threat and secure our internal environment. . . . After an extensive forensic investigation and complex manual document review, we discovered on June 27, 2025, that the impacted systems, which were accessed between December 13, 2024, and December 21, 2024, contained some of your personal information and/or protected health information as described in more detail below.

44.     Omitted from the Notice Letters were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

45.     Thus, Defendant's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' abilities to mitigate the harms resulting from the Data Breach are severely diminished.

46.     As the Data Breach evidences, Defendant did not use reasonable security measures appropriate to the nature of the sensitive Private Information it collected and maintained, such as encrypting the information or deleting it when it is no longer needed. These failures allowed and caused cybercriminals to target Plaintiffs' and Class Members' Private Information on Defendant's systems and carry out the Data Breach.

47.     Plaintiffs' and Class Members' Private Information was targeted, accessed, stolen, and on information and belief, held for ransom by cybercriminals through the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiffs' and Class Members' Private Information from Defendant's network systems, where they were kept without adequate safeguards and in unencrypted form.

48.     Defendant could have prevented this Data Breach by ensuring its files and servers containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted, but failed to do so.

49.     Defendant's tortious conduct and breach of contractual obligations are further evidenced by its failure to recognize the Data Breach until cybercriminals had already breached Defendant's systems and accessed it for a week, meaning Defendant had no effective means in place to ensure ongoing cyberattacks were detected.

50.     Defendant's negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

**C.     Defendant Knew the Risk of a Cyberattack because Healthcare Providers in Possession of Private Information are Particularly Suspectable.**

51.     Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

52.     Data thieves regularly target businesses in the healthcare industry like Defendant due to the highly sensitive information that such entities maintain. Defendant knew and understood that unprotected Private Information is highly sought after by criminals who seek to illegally monetize it through unauthorized access.

53.     Cyber-attacks against businesses that collect PII/PHI are targeted and frequent. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as reasonable business handling PII and PHI, should have known, that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

54.     According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017."[2]

55.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[3]

---

[2] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," ITRC, Jan. 24, 2022,   available                    at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last visited Aug. 22, 2024 ).
[3] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Feb. 9, 2024).

56.     Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting entities like Defendant that collect and store PHI.

57.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

58.     Entities in custody of PHI, like Defendant, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach. Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the average total cost to resolve an identity theft-related incident came to about $20,000, and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage. Almost 50% of the victims lost their healthcare coverage as a result of the incident,

while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all.

59.    Thus, the healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[4]

60.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

61.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[5] A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.

---

[4] 9 Reasons why Healthcare is the Biggest Target for Cyberattacks, Swivelsecure, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Aug. 23, 2024).

[5] You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows, IDExperts, May 14, 2015, https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Aug. 23, 2024).

62.    As a medical device provider in possession of customers' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to their Private Information's wrongful disclosure.

63.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its systems, amounting to tens of thousands of individuals' detailed Private Information, and, thus, that these individuals would be harmed by the unauthorized disclosure of that unencrypted data.

64.    Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

65.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

**D.    Defendant Was Required, But Failed to Comply with FTC Rules and Guidance.**

66.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.

According to the FTC, the need for data security should be factored into all business decision-making.

67.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

68.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

69.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

70.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect confidential PII/PHI, treating the failure

to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

71.    Such FTC enforcement actions include actions against entities in the healthcare industry like Defendant. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

72.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

73.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or

why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[6]

74.    Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

75.    Defendant's failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**E.    Defendant Was Required, But Failed to Comply with HIPAA.**

76.    Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and C.

77.    Defendant is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. See 42 U.S.C. §17921; 45 C.F.R. § 160.103.

78.    HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

---

[6] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

79.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

80.    HIPAA's Security Rule required and requires that Defendant do the following:

a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.  Ensure compliance by its workforce.

81.    HIPAA also required and requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is and was required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only

to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

82.    HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. See 45 C.F.R. § 164.306(a)(1), (a)(3).

83.    HIPAA further requires covered entities like Defendant to have and apply appropriate sanctions against members of their workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

84.    HIPAA further requires covered entities like Defendant to mitigate, to the extent practicable, any harmful effect that is known to the entity of a use or disclosure of PHI in violation of the entity's policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

85.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis

requirements of the Security Rule."[7] The list includes a link to guidelines set by the National Institute of Standards and Technology, which represent the industry standard for good business practices with respect to standards for securing e-PHI.

86.     HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured patient PHI (counted from the day a breach reasonably should have been discovered), as is this Data Breach, Defendant must notify each individual affected regarding the nature of the breach, the PHI compromised, steps to protect against potential resulting harm, and what Defendant is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

87.     As alleged herein, Defendant violated HIPAA and HITECH. Defendant failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach, failed to ensure the confidentiality of PHI, and failed to use appropriate safeguards to prevent the unauthorized disclosure of Plaintiffs' and Class Members' Private Information.

**F.     Defendant Failed to Comply with Industry Standards.**

88.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

89.     The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent

---

[7] HHS, Security Rule Guidance Material, Aug. 21, 2024, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Aug. 23, 2024).

cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

90.    In addition, the NIST recommends certain practices to safeguard systems, infra, such as the following:

 a. Control who logs on to your network and uses your computers and other devices.

 b. Use security software to protect data.

 c. Encrypt sensitive data, at rest and in transit.

 d. Conduct regular backups of data.

 e. Update security software regularly, automating those updates if possible.

 f. Have formal policies for safely disposing of electronic files and old devices; and

 g. Train everyone who uses your computers, devices, and network about cybersecurity.

91.     Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cyberattacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior, [e]nabl[ing] logging in order to better investigate issues or events[,] and [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated"; (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and; (d) other steps.[8]

92.     Upon information and belief, Defendant failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01,

---

[8] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 9, 2024).

PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

**G.  Defendant Owed Plaintiffs and Class Members Common Law Duties to Safeguard their Private Information.**

93.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. This duty obligated Defendant to provide reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Private Information in its care from unauthorized disclosure.

94.    Defendant owed duties to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training employees and others who accessed Private Information on how to adequately protect it.

95.    Defendant owed duties to Plaintiffs and Class Members to implement processes that would promptly detect unauthorized access to Private Information.

96.    Defendant owed duties to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

97.    Defendant owed duties to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

98.    Defendant owed these duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

99.    Defendant failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

**H.    Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.**

100.    Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly injured them by the resulting disclosure of their Private Information in the Data Breach.

101.    The ramifications of Defendant's failures to keep Plaintiffs' and Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

102.    Plaintiffs and Class Members are also at a continued risk because their Private Information remains in Defendant's systems, which have already been

shown to be susceptible to compromise and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its customers' privacy.

103.  As a result of Defendant's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiffs' and Class Members' Private Information ending up in criminals' hands, Plaintiffs and Class Members have suffered and will continue to suffer the following injuries and damages, without limitation: (a) actual identity theft, fraud and misuse of Private Information; (b) financial costs and lost time attending to actual identity theft, fraud, and misuse; (c) an imminent, increased risk of future identity theft; (d) lost time and costs mitigating the increased risk of identity theft; (e) invasion of privacy; (f) deprivation of value of Private Information; (g) lost benefit of their bargains with Defendant; (h) emotional distress including stress and anxiety; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to take appropriate and adequate measures to protect it.

### *Present and Ongoing Risk of Identity Theft*

104.  Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

105.  Upon information and belief, Plaintiffs' and the Class Members' Private Information has already been sold on the dark web. Indeed, Plaintiff

Edwards began receiving notifications in early 2025 – just a few short weeks after the Data Breach – that her Private Information was found on the dark web.

106.  The link between a data breach and identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the dark web internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

107.  The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.  This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

108.  A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PHI and PII like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery

address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information. As Microsoft warns, "The anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[9]

109.    The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. And on information and belief, at least some of the Private Information stolen in the Data Breach has already been published on the dark web. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

110.    Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, like his or her birthdate, birthplace, or mother's maiden name.

111.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to

---

[9] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

attempt other hacking crimes against the individual to obtain more data to perfect a crime.

112.   For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

113.   One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[10]

---

[10] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Feb. 26, 2024).

114. With Fullz packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

115. The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

116. The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

117. Social Security are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and

are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[11]

118.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

119.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

---

[11] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[12] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthems-s-hackers-has-millions-worrying-about-identity-theft (last visited Aug. 23, 2024).

120.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.

121.    Theft of PHI, in particular, is gravely serious as well: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[13]

122.    PHI is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.

---

[13] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Aug. 23, 2024).

123.   Another study found 70% of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft.

124.   Medical identity theft is also a great concern not only because it is the most expensive and time consuming to resolve, but because of all of the types of identity theft which are  often very difficult to detect, medical identity theft is extremely dangerous.

125.   The reality is that cybercriminals seek nefarious outcomes from a data breach, and PHI can be used to carry out a variety of crimes.

126.   Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[14]

127.   According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of

---

[14] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).

complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

128.   Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

129.   Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### Lost Time Mitigating the Risk of Identify Theft and Fraud

130.   In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, victims must spend a considerable amount of time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

131.   As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of

fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

132.   Recognizing this need, in its Notice Letters, Defendant's expressly encourages Plaintiffs and the Class Members to obtain and monitor their credit reports, place a freeze on their credit file, and enroll in credit monitoring services.

133.   Defendant's extensive suggestion of steps that Plaintiffs and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

134.   The United States Government Accountability Office released a report in 2007 on data breaches, in which it noted victims of identity theft will face substantial costs and time to repair the damage to their name and credit record.

135.   Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

136.   Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes

and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

137.   These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

138.   Once Private Information is exposed, there is virtually no way to ensure it has been fully recovered or contained against future misuse. Plaintiffs and Class Members will thus need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct and consequential Data Breach.

### *Diminished Value of Private Information*

139.   Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America, and consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable value.

140.   For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

141.   Private Information can sell for as much as $363 per record.

142.   Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

143.   An active and robust legitimate market for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

144.   As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

145.   However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss.

Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Reasonable and Necessary Future Cost of Credit Monitoring*

146.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

147.   Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

148.   Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers and medical records).

149.  Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever, and must spend money on reasonable mitigation measures to mitigate that risk.

150.  The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### *Lost Benefit of the Bargain*

151.  Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

152.  When agreeing to provide their Private Information, which was a condition precedent to obtain medical devices from Defendant, and paying Defendant, directly or indirectly, for these products and related services, Plaintiffs and Class Members as patients and consumers understood and expected that they were, in part, paying a premium for services and legally required data security to protect the Private Information they were required to provide.

153.  Plaintiffs value data security. Indeed, data security is an important consideration for seeking healthcare and medical products.

154.  In 2024, the technology and communications conglomerate Cisco published the results of its multi-year Consumer Privacy Survey. Therein, Cisco

reported the following:

> For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data. [15]

155.   The same survey found, "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."  And 89% of consumers stated, "I care about data privacy,"  while 83% declared, "I am willing to spend time and money to protect data," and, "I expect to pay more" for privacy.

156.   In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

## V.    PLAINTIFFS' EXPERIENCES AND INJURIES

### *Plaintiff Brett Conner*

157.   Plaintiff Conner is a patient and customer of Defendant and provided his Private Information to Defendant as a condition and in exchange for Defendant's products and related services.

---

[15] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, Cɪsᴄᴏ, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Oct. 31, 2025).

158.   Plaintiff Conner greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Conner diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

159.   At the time of the Data Breach, Defendant retained Plaintiff Conner's Private Information on its systems with inadequate data security, causing Plaintiff Conner's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

160.   Plaintiff Conner received Defendant's Notice Letter dated August 15, 2025, informing that his Private Information was compromised in the Data Breach.

161.   Plaintiff Conner's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

162.   Plaintiff Conner's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Conner's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

163.   Plaintiff Conner has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the

legitimacy of the Data Breach, monitoring his accounts and changing passwords, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

164.   Plaintiff Conner further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Conner is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

165.   The risk of identity theft is impending and has materialized, as Plaintiff Conner's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals.

166.   Plaintiff Conner further believes his Private Information, and that of Class Members, has or will be sold and disseminated on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

167.   Plaintiff Conner has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

168.   The Data Breach has caused Plaintiff Conner to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft.

### *Plaintiff Juwan Overshown*

169.   Plaintiff Overshown is a current patient and customer of Defendant, and provided his Private Information to Defendant as a condition and in exchange for Defendant's products and related services.

170.   Plaintiff Overshown greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Overshown diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

171.   At the time of the Data Breach, Defendant retained Plaintiff Overshown's Private Information on its systems with inadequate data security, causing Plaintiff Overshown's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

172.   Plaintiff Overshown received the Notice Letter dated August 15, 2025, informing him that his Private Information was compromised in the Data Breach.

173.   Plaintiff Overshown's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's

network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

174.  Plaintiff Overshown's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Overshown's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

175.  Additionally, Plaintiff Overshown has been the victim of identity theft and fraud due to the Data Breach. Shortly after the Data Breach, an unauthorized actor misused Plaintiff Overshown's stolen Private Information to make a fraudulent charge of $500 to Plaintiff Overshown's bank account. Despite Plaintiff Overshown spending approximately two hours attempting to resolve the $500 fraudulent charge, he was unable to get it reimbursed.

176.  Plaintiff Overshown has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to hours researching and verifying the legitimacy of the Data Breach, monitoring his accounts and changing passwords, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

177.  Plaintiff Overshown further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by

the Data Breach. Due to the Data Breach, Plaintiff Overshown is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

178.   The risk of identity theft is impending and has materialized, as Plaintiff Overshown's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals. Indeed, Plaintiff Overshown's Private Information has already been misused to commit identity theft due to the Data Breach.

179.   Plaintiff Overshown further believes his Private Information, and that of Class Members, has or will be disseminated on the dark web for years, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

180.   Plaintiff Overshown has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that the spam communications began the month after the Data Breach occurred, and cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

181.   The Data Breach has caused Plaintiff Overshown to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft.

*Plaintiff Diane Edwards*

182.  Plaintiff Diane Edwards is a former customer and patient of Defendant, having received a CPAP machine and resupplies from Defendant from approximately 2019–2023. As a condition of receiving Defendant's products and related services, Plaintiff Diane Edwards was required to entrust her Private Information to Defendant.

183.  Plaintiff Edwards greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Edwards takes data security extremely seriously. She diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

184.  Plaintiff Edwards would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

185.  At the time of the Data Breach, Defendant retained Plaintiff Edwards's Private Information in its network systems with inadequate data security, causing Plaintiff Edwards's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

186.  Plaintiff Edwards received Defendant's Notice Letter dated August 15, 2025, informing her that her Private Information was compromised in the Data Breach.

187.   Due to the Data Breach, Plaintiff Edwards's Private Information has already been misused, evidenced by multiple notifications Plaintiff Edwards has received since early 2025 informing her that her Private Information was found published on the dark web.

188.   Plaintiff Edwards has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to hours researching the Data Breach, reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud, and changing passwords to her financial accounts. Additionally, due to the increased risk of identity theft the Data Breach caused, Plaintiff Edwards froze her credit, causing an additional inconvenience. Plaintiff Edwards now monitors her financial and credit statements multiple times a week and has spent hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

189.   Additionally, Plaintiff Edwards pays approximately $32 per month for credit monitoring services, which is an expense Plaintiff Edwards will reasonably need to incur for years to come due to her Private Information's wrongful disclosure in the Data Breach.

190.   Plaintiff Edwards further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Edwards is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

191.   The risk of identity theft is impending and has materialized, as Plaintiff Edwards's Private Information was targeted, accessed, misused, and has been published on the dark web. Plaintiff Edwards reasonably believes her and Class Members' Private Information will continue to be published and disseminated on the dark web into the future, as that is the *modus operandi* of cybercriminals that commit attacks of this type and who visit dark web leak pages.

192.   Plaintiff Edwards's Private Information stolen in the Data Breach has also been misused to inundate her with spam and scam calls, texts, and emails. Worryingly, since approximately January 2025, Plaintiff Edwards has been flooded with spam calls, typically from the same woman who refers to herself as "Ashley," that refer to Plaintiff Edwards specifically by name and attempt to discuss enrolling in college or completing paperwork for a loan she did not apply for. The sharp increase in spam calls has also caused Plaintiff Edwards additional lost time and inconvenience, and she now screens every phone call she receives.

193.   The Data Breach has also caused Plaintiff Edwards to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence or the information stolen, and by the multiple spam calls flooding her phone each day.

### *Plaintiff Stephen Follett*

194.   Plaintiff Follett is a patient and customer of Defendant and provided his Private Information to Defendant as a condition and in exchange for Defendant's products and related services.

195.   Plaintiff Follett greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Follett diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

196.   At the time of the Data Breach, Defendant retained Plaintiff Follett's Private Information on its systems with inadequate data security, causing Plaintiff Follett's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

197.   Plaintiff Follett received Defendant's Notice Letter dated August 15, 2025, informing him that his Private Information was compromised in the Data Breach.

198.   Plaintiff Follett's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

199.   Plaintiff Follett's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Follett's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

200.   Plaintiff Follett has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, monitoring his accounts and changing passwords, freezing his credit, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

201.   Plaintiff Follett further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Follett is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

202.   The risk of identity theft is impending and has materialized, as Plaintiff Follett's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals.

203.   Plaintiff Follett further believes his Private Information, and that of Class Members, has or will be sold and disseminated on the dark web for years, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

204.   Plaintiff Follett has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email

address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

205. The Data Breach has caused Plaintiff Follett to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft.

### *Plaintiff Roderic Woods*

206. Plaintiff Woods is a patient and customer of Defendant and provided his Private Information to Defendant as a condition and in exchange for Defendant's products and related services.

207. Plaintiff Woods greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Woods diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

208. At the time of the Data Breach, Defendant retained Plaintiff Woods's Private Information on its systems with inadequate data security, causing Plaintiff Woods's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

209. Plaintiff Woods received Defendant's Notice Letter dated August 15, 2025, informing him that his Private Information was compromised in the Data Breach.

210.   Plaintiff Woods's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

211.   Plaintiff Woods's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Woods's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

212.   Plaintiff Woods has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, monitoring his accounts and changing passwords, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

213.   Plaintiff Woods further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Woods is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

214.   The risk of identity theft is impending and has materialized, as Plaintiff Woods's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals.

215.   Plaintiff Woods further believes his Private Information, and that of Class Members, has or will be disseminated on the dark web for years, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

216.   Plaintiff Woods has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

217.   The Data Breach has caused Plaintiff Woods to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft.

### *Plaintiff John Crist*

218.   Plaintiff Crist is a former contract employee of Defendant and provided his Private Information to Defendant as a condition and in exchange for employment.

219.   Plaintiff Crist greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Crist diligently protects his Private Information and stores any documents containing Private Information in a

safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

220.    At the time of the Data Breach, Defendant retained Plaintiff Crist's Private Information on its systems with inadequate data security, causing Plaintiff Crist's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

221.    Plaintiff Crist received Defendant's Notice Letter dated August 15, 2025, informing him that his Private Information was compromised in the Data Breach.

222.    Plaintiff Crist's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

223.    Plaintiff Crist's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Crist's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

224.    Additionally, Plaintiff Crist's Private Information compromised in the Data Breach has been misused in connection with credit inquiries in his name that he did not authorize, which occurred in July 2025. Given the sequence and short amount of time between the Data Breach and these unauthorized credit inquiries,

and the type of Private Information involved, this misuse of Plaintiff Crist's Private Information is directly traceable to the Data Breach.

225.   Plaintiff Crist has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to approximately three hours per month since the Data Breach researching and verifying the legitimacy of the Data Breach, monitoring his accounts and changing passwords, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

226.   Plaintiff Crist further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Crist is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

227.   The risk of identity theft is impending and has materialized, as Plaintiff Crist's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals.

228.   Plaintiff Crist further believes his Private Information, and that of Class Members, has or will be sold and disseminated on the dark web for years, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

229.   Plaintiff Crist has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach,

given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

230.    The Data Breach has caused Plaintiff Crist to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft. Plaintiff Crist has suffered emotional distress in particular due to the unauthorized credit inquiries misusing his compromised Private Information, which have caused him significant anxiety.

### Plaintiff Chris Harriman

231.    Plaintiff Harriman is a patient and customer of Defendant and provided his Private Information to Defendant as a condition and in exchange for Defendant's products and related services.

232.    Plaintiff Harriman greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Harriman diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

233.    At the time of the Data Breach, Defendant retained Plaintiff Harriman's Private Information on its systems with inadequate data security, causing Plaintiff

Harriman's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

234.    Plaintiff Harriman received a Notice Letter dated August 15, 2025, informing him that his Private Information was compromised in the Data Breach.

235.    Plaintiff Harriman's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

236.    Plaintiff Harriman's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Harriman's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

237.    Plaintiff Harriman has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, monitoring his accounts and changing passwords, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

238.    Plaintiff Harriman further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Harriman is at a present risk and

will continue to be at increased risk of identity theft and fraud for years to come.

239.   The risk of identity theft is impending and has materialized, as Plaintiff Harriman's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals.

240.   Plaintiff Harriman further believes his Private Information, and that of Class Members, has or will be disseminated on the dark web for years, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

241.   Plaintiff Harriman has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

242.   The Data Breach has caused Plaintiff Harriman to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft.

### *Plaintiff Tyrone Gibbs*

243.   Plaintiff Gibbs is a patient and customer of Defendant and provided his Private Information to Defendant as a condition and in exchange for Defendant's products and related services.

244.  Plaintiff Gibbs greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Gibbs diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

245.  At the time of the Data Breach, Defendant retained Plaintiff Gibbs's Private Information on its systems with inadequate data security, causing Plaintiff Gibbs's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

246.  Plaintiff Gibbs received Defendant's Notice Letter dated August 15, 2025, informing him that his Private Information was compromised in the Data Breach.

247.  Plaintiff Gibbs's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud.

248.  Plaintiff Gibbs's Private Information compromised in the Data Breach has already been misused, as cybercriminals targeted Plaintiff Gibbs's Private Information, stole it from Defendant's systems, and on information and belief, held the data for ransom and will imminently post it on the dark web, that has not been done already.

249.   Plaintiff Gibbs has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, monitoring his accounts and changing passwords, and contacting counsel regarding the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

250.   Plaintiff Gibbs further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Gibbs is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

251.   The risk of identity theft is impending and has materialized, as Plaintiff Gibbs's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals.

252.   Plaintiff Gibbs further believes his Private Information, and that of Class Members, has or will be sold and disseminated on the dark web for years, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

253.   Plaintiff Gibbs has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information him, such as his phone number or email

address, from publicly available sources, including websites that aggregate and associate PII with the owner of such information.

254.   The Data Breach has caused Plaintiff Gibbs to suffer anxiety and stress because he expected Defendant to reasonably protect his Private Information and now his confidential data is in cybercriminals' possession, causing a continuing invasion of privacy and risk of identity theft.

## VI.    CLASS ACTION ALLEGATIONS

255.   Plaintiffs bring this nationwide class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(3) and (c)(4).

256.   The class Plaintiffs seek to represent is defined as follows:

> All individuals in the United States whose Private Information may have been compromised in the Data Breach, including all individuals who received a Notice Letter ("Class").

257.   Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

258.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

259. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendant has reported that the Private Information of 90,133 individuals throughout the United States was compromised in the Data Breach.

260. **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

c. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

d. Whether Defendant had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

e. Whether Defendant knew or should have known of the data security vulnerabilities that allowed the Data Breach to occur;

f. Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Defendant's data security systems prior to, during, and since the Data Breach complied with industry standards;

h. When Defendant actually learned of the Data Breach;

i.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members their Private Information had been compromised;

j.  Whether Defendant violated data breach notification laws by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

k.  Whether Defendant's conduct violated the FTC Act, HIPAA, and/or HITECH;

l.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

m.  Whether Defendant adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;

n.  Whether Defendant was unjustly enriched by failing to provide adequate security for Plaintiffs' and Class Members' Private Information;

o.  Whether Plaintiffs and Class Members are entitled to actual, consequential, nominal, statutory, and/or punitive damages as a result of Defendant's wrongful conduct;

p.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

q. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm the Data Breach caused.

261. **Typicality:** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subject to the same unlawful conduct as alleged herein, and were damaged in the same way. Plaintiffs' Private Information was in Defendant's possession at the time of the Data Breach and was compromised due to the Data Breach. Plaintiffs' damages and injuries are akin to those of other Class Members and Plaintiffs seek relief consistent with the relief of the Class.

262. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs are all Class Members and are committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of all the Classes.

263. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiffs and Class Members may not be sufficient to justify individual

litigation. Here, the damages suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of one adjudication, economies of scale, and comprehensive supervision by a single court.

264. **Manageability:** The litigation of the class claims alleged herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

265. **Ascertainability:** All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendant has access to information regarding the individuals affected by the Data Breach, and has already provided notifications to some or all of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice.

266. **Particular Issues:** Particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant formed and breached implied contracts with Plaintiffs and Class Members;

c. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

d. Whether Class Members are entitled to actual, consequential, statutory, and/or nominal damages, and/or injunctive relief.

## VII.    CAUSES OF ACTION

### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
**(On behalf of Plaintiffs and the Class)**

267. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 266 above as if fully set forth herein.

268. Defendant required Plaintiffs and Class Members to submit personal, confidential Private Information to Defendant as a condition of receiving healthcare products and related services.

269. Plaintiffs and Class Members provided Private Information to Defendant in exchange for Defendant's products and services.

270. Defendant had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had duties to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

271. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

272. Plaintiffs and Class Members had no ability to protect their Private Information in Defendant's possession.

273. By collecting and storing Plaintiffs' and Class Members' Private Information, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

274. Defendant owed a duty to Plaintiffs and Class Members to provide data security consistent with industry standards and legal and regulatory requirements, to ensure that its systems and the personnel responsible for them adequately protected Plaintiffs' and Class Members' Private Information.

275. Defendant was able to ensure that its systems and data security procedures were sufficient to protect against the foreseeable risk of harm to

Plaintiffs and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiffs and Class Members were not.

276.   Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

277.   Pursuant to the FTC Act, Defendant had a duty to provide adequate systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

278.   Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had the further duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI from unauthorized disclosure.

279.   Defendant breached its duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information and by failing to encrypt or timely delete the Private Information from its network systems.

280.   Defendant's violations of the FTC Act and HIPAA as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

281.   Plaintiffs and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

282.   The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

283.   Defendant's failures to comply with the FTC Act and/or HIPAA is negligence *per se.*

284.   Defendant's duties to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Defendant is bound by industry standards to secure such Private Information.

285.   Defendant's duties to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because it was foreseeable to Defendant that failure to adequately safeguard Private Information would cause the data's wrongful disclosure in a breach.

286.   Defendant breached its duties and was negligent by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

b.   Failing to adequately train employees on proper cybersecurity protocols;

c.   Failing to adequately monitor the security of its information technology networks and systems;

d.  Failure to periodically ensure that its network systems had plans in place to maintain reasonable data security safeguards; and

e.  Allowing unauthorized access to Plaintiffs' and Class Members' Private Information.

287.   But for Defendant's wrongful and negligent breaches of its duties owed to Plaintiffs and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiffs' and Class Members' Private Information would not have been compromised, and Plaintiffs' and Class Members' injuries would have been avoided.

288.   It was foreseeable that Defendant's failures to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would injure Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable to Defendant given the known high frequency of cyber-attacks and data breaches in its industry.

289.   It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would cause them one or more types of injuries.

290.   As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, as set forth herein.

291.   Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT II: BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiffs and the Class)

292.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 266 above as if fully set forth herein.

293.    Defendant required Plaintiffs and Class Members to provide and entrust their Private Information to Defendant as a condition of obtaining healthcare products and related services.

294.    Defendant solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

295.    When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiffs and Class Members if and when their Private Information was breached and compromised.

296.    Specifically, Plaintiffs and Class Members entered into valid and enforceable implied contracts Defendant when they agreed to provide their Private Information and/or payment to Defendant.

297.    The valid and enforceable implied contracts Plaintiffs and Class Members had with Defendant included Defendant's implicit promise to protect Private Information it collected from Plaintiffs and Class Members, or created on

its own, from unauthorized disclosure. Plaintiffs and Class Members provided their Private Information in reliance on Defendant's promises.

298.   Under the implied contracts, Defendant promised and was obligated to (a) provide healthcare products and related services to Plaintiffs and Class Members; and (b) protect Plaintiffs' and Class Members' Private Information provided to obtain such products and services and/or created in connection therewith. In exchange, Plaintiffs and Class Members agreed to provide Defendant with payment and their Private Information.

299.   Defendant promised and warranted to Plaintiffs and Class Members, including through its public-facing privacy notice identified above, to maintain the privacy and confidentiality of the Private Information it collected from Plaintiffs and Class Members and to keep such information safeguarded against unauthorized access and disclosure, consistent with applicable law and industry standards.

300.   Defendant's adequate protection of Plaintiffs' and Class Members' Private Information was a material aspect of these implied contracts with Defendant.

301.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA, HITECH, and industry standards.

302.   Plaintiffs and Class Members who contracted with Defendant for healthcare and provided their Private Information to Defendant reasonably

believed and expected that Defendant would adequately employ adequate data security to protect that Private Information.

303.    A meeting of the minds occurred when Defendant required Plaintiffs and the Class Members to provide their Private Information as a mandatory condition to their receipt of healthcare products and services and Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendant.

304.    Plaintiffs and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendant.

305.    Defendant materially breached its contractual obligation to protect the Private Information it required Plaintiffs and Class Members provide when that Private Information was wrongfully disclosed in the Data Breach due to Defendant's inadequate data security measures and procedures.

306.    Defendant materially breached the terms of the implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, by failing to otherwise protect Plaintiffs' and Class Members' Private Information.

307.    The Data Breach and Plaintiffs' and Class Members' consequential damages were a reasonably foreseeable result of Defendant's conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiffs and Class Members.

308.    As a result of Defendant's failures to fulfill the data security protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains with Defendant, and instead received products and services of a diminished value compared to that described in the implied contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the products and services with data security protection they paid for and that which they received.

309.    As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiffs and Class Members and the attendant Data Breach, Plaintiffs and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendant.

310.    Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

## COUNT III: UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the Class)

311.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 266 above as if fully set forth herein.

312.    Plaintiffs and Class Members conferred benefits on Defendant by way providing payment and their Private Information to Defendant in Defendant's course of business.

313.   Defendant required Plaintiffs' and Class Members' Private Information to conduct its business and generate revenue, including by receiving assignments of benefit and billing and getting paid for its products and services, which Defendant could not do without collecting and maintaining Plaintiffs' and Class Members' Private Information.

314.   Additionally, on information and belief Defendant's CPAP devices include a price premium for features that store, analyze, and transmit patients' electronic PHI, further demonstrating the benefit Plaintiffs and Class Members' Private Information provided.

315.   The monies Plaintiffs and Class Members paid to Defendant included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

316.   Additionally, a reasonable portion of the profit Defendant made from furnishing its products and services, which necessarily required Defendant's access to patient Private Information, should have been put towards data security measures that would adequately protect the Private Information in Defendant's care.

317.   Instead, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security

that would have prevented the hacking incident, Defendant calculated to increase its own profits at Plaintiffs' and Class Members' expense by utilizing cheaper, ineffective security measures and diverting those funds to Defendant's own coffers. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of patients' Private Information.

318.  Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Defendant was unjustly enriched.

319.  Under principles of equity and good conscience, Defendant should not be permitted to retain its ill-gotten gains because it failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class Members' Private Information, which Plaintiffs and Class Members paid for but did not receive.

320.  Defendant wrongfully accepted and retained these benefits—payment and Plaintiffs' and Class Members' Private Information—and was enriched to the detriment of Plaintiffs and Class Members.

321.  As a result of Defendant's wrongful conduct and resulting unjust enrichment, Plaintiffs and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus reasonable attorneys' fees and costs.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment as follows:

A.    An Order certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.    Awarding Plaintiffs and the Class damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

D.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

E.    Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiffs and the Class;

F.    Enjoining Defendant from further deceptive practices and making untrue statements about their data security, the Data Breach, and the transmitted Private Information;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding pre- and post-judgment interest, as provided by law; and

I.      Awarding such further relief to which Plaintiffs and the Class are entitled.

## IX.     DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues to triable.

Dated: November 10, 2025

Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow (FBN 121452)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.332.4200
ostrow@kolawyers.com

Mariya Weekes (FBN 56299)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (866) 252-0878
mweekes@milberg.com

Marc H. Edelson (*pro hac vice* forthcoming)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com

*Interim Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

By: _/s/ Jeff Ostrow_____
     Jeff Ostrow